Daniel KUNIN, Plaintiff–Appellee,

v.

**BENEFIT TRUST LIFE INSURANCE COMPANY, Defendant–Appellant.**

No. 88–6573.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 2, 1989.

Decided March 21, 1990.

As Amended on Denial of
Rehearing July 27, 1990.

Robert F. Keehn, Booth, Mitchel & Strange, Los Angeles, Cal., for defendant-appellant.

Sanford M. Gage and Thomas F. Borcher, Beverly Hills, Cal., for plaintiff-appellee.

Before NORRIS, REINHARDT and TROTT, Circuit Judges.

REINHARDT, Circuit Judge:

Benefit Trust Life Insurance Company ("Benefit Trust") appeals the decision of the district court awarding benefits to Daniel Kunin ("Kunin"). Kunin, the Senior Vice–President of Maxim's Beauty Salons, Inc., incurred over $50,000 in medical bills for the treatment of his child for autism. Kunin sought reimbursement of his expenses under a group health insurance policy issued to his employer; the parties agree that this policy is itself an "employee welfare benefit plan" governed by ERISA, and that Benefit Trust functioned as both insurer and plan administrator. Following a brief investigation, Benefit Trust agreed to pay $10,000, but no more, on the ground that autism fell within the policy's limitation for "mental illness." The district court concluded that autism is not a mental illness and that the denial of benefits was arbitrary and capricious, and ordered that the claim be paid in full. We agree that Benefit Trust was obligated to pay the full amount of the claim.

Benefit Trust's medical director's cursory investigation did not provide reasonable grounds for determining that autism is a mental illness. The testimony of Kunin's experts amply supports the finding that Benefit Trust's denial of benefits on the basis of that inquiry was arbitrary and capricious. Moreover, it is unclear whether the term "mental illness" encompasses autism. Under the law of all fifty states and the District of Columbia, where an unclear or ambiguous term is used in an insurance policy, the ambiguity must be construed in favor of the insured. We therefore hold, in the alternative, that this rule of construc-tion applies in the case before us, whether as a uniform rule of federal common law, or because federal common law incorporates state law on this point.

## FACTS

Benefit Trust is the insurer and plan administrator of a group health and medical policy which covers Kunin by virtue of his employment status with Maxim's. The policy is an "employee welfare benefit plan" as defined by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(1).

In 1986 Kunin's son, Alex, received treatment for autism for approximately thirty days at the UCLA Neuropsychiatric Institute. Having incurred $54,696.96 in hospital bills as a result of his son's stay, Kunin submitted a claim to Benefit Trust.

The policy limits medical benefits for "mental illness or nervous disorders" to $10,000 per calendar year. Benefit Trust refused to pay any amount in excess of that sum because it determined that autism was a mental illness within the meaning of the policy, and was therefore subject to the policy's limiting clause. This decision was based on the recommendation of Dr. Zolot, Benefit Trust's medical director. Dr. Zolot made the determination that autism was a mental illness after having informal conversations with three psychiatrists, whose experience with autism is unknown, and after reviewing a textbook definition of autism which states that autism is generally accepted to be organically based, although it was once thought to be "primarily psychiatric."

Kunin filed suit in state court, challenging Benefit Trust's interpretation of the policy. Benefit Trust removed the matter to federal court, asserting federal question jurisdiction under ERISA. Kunin acknowledged this basis of federal jurisdiction, conceded that his state claims were preempted, and proceeded solely on the basis of his ERISA claim.

## THE DISTRICT COURT OPINION

The issue put to the district court by the parties was whether Benefit Trust's denial

of benefits, based on its view that autism was a mental illness, was arbitrary and capricious. The court noted that while administrators' decisions are normally reviewed under an "arbitrary and capricious" standard, less rigorous standards have been applied when the administrator is not entirely impartial or objective, and may have a vested interest in denying benefits. It said that where the plan administrator is also the insurer, as in the present case, a lower standard of review might be appropriate. *Kunin v. Benefit Trust Life Ins. Co.*, 696 F.Supp. 1342, 1345 (C.D.Cal.1988). However, since it concluded that the decision of Benefit Trust could be overturned even under the "arbitrary and capricious" standard, the court declined to decide whether a lower standard of review would ordinarily be applicable. *Id.*

Although insurance contract terms are interpreted as a lay person would interpret them, the district court primarily considered the testimony of experts. However, it, correctly, relied on that testimony solely in order to determine the "plain and ordinary" meaning· of the term "mental illness." Kunin's expert, Dr. Betty Jo Freeman, testified that "mental illness" refers to "a behavioral disturbance with no demonstrable organic or physical basis.... [It] stems from reaction to environmental conditions as distinguished from organic causes." Autism clearly falls outside the scope of mental illness under this definition. Dr. Ritvo, Kunin's second expert, agreed with the definition, and testified that his experiences with families of autistic individuals have shown that the disease is not commonly perceived as a mental illness.[1] The court found the testimony of these experts "clear, authoritative, and entirely convincing," and found their definition of "mental illness" consistent with the plain and ordinary meaning of the term. *Id.* at 1346.

Benefit Trust's expert, Dr. Marvin Gillick, first offered a definition of "mental disorder" found in the American Psychiatric Association's *Psychiatric Glossary.* "Mental disorder" is defined as "an illness with ... impairment in functioning due to a social, psychologic, genetic, physical/chemical, or biologic disturbance.... The illness is characterized by *symptoms* and/or impairment in functioning."[2]

The district court rejected Dr. Gillick's definition, noting that it could include a myriad of ailments that would never be considered mental illnesses, such as cancer or a broken leg. Dr. Gillick then suggested that mental illness was "an aberrant behavior syndrome or manifestation which has its basis in the neurological axis and/or central nervous system, but whose precise etiology is uncertain." The court rejected this definition as well, because it would exclude illnesses clearly within the ambit of mental illness solely because their causes are known. *Id.*

The court then accepted the definition offered by Kunin's experts. It held that including autism within the limitation clause covering mental illness was not a reasonable interpretation of the contract and the plan, and that the denial of benefits was arbitrary and capricious, and in violation of 29 U.S.C. § 1132. Kunin was awarded the claimed benefits plus pre-judgment interest. *Id.* at 1346–47.

## ANALYSIS

### A. The Standard of Review

1. *Reviewing the ERISA Administrator's Denial of Benefits*

Until recently in this circuit, denial of benefits by an ERISA administrator could ordinarily only be reversed by the district court if the decision was "arbitrary, capricious, made in bad faith, not supported by substantial evidence or erroneous as a matter of law." *Johnson v. District 2 Marine Eng'rs Beneficial Ass'n,* 857 F.2d 514, 516 (9th Cir.1988). An administrator's opinion was said not to be arbitrary or capricious

---

**1.** Dr. Ritvo has participated in the publication of over 100 papers on autism, and, we are told, is generally recognized as the world's foremost authority on the subject.

**2.** Dr. Gillick is a board certified psychiatrist, but has had limited experience with autistic individuals.

"if it [was] a reasonable interpretation of the plan's terms and was made in good faith." *Dockray v. Phelps Dodge Corp.,* 801 F.2d 1149, 1152 (9th Cir.1986). However, when an administrator had a conflict of interest, then the district court was required to give the determination less deference than ordinarily afforded under the arbitrary and capricious standard. *Id.* In the present case, Benefit Trust has a conflict of interest, because it was the insurer as well as the administrator of the plan.

After the district court issued its opinion, the Supreme Court adopted a substantially different rule concerning the standard of review. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), the Court held that denial of benefits challenged under section 1132(a)(1)(B) should be reviewed *de novo* unless the plan gives the administrator the authority to exercise discretion in determining ineligibility or construing the terms of the plan. Kunin would have this court review Benefit Trust's denial of benefits under the newly announced *de novo* standard.

While acknowledging that after *Firestone* the administrator's decision would ordinarily be reviewed *de novo,* Benefit Trust contends that here it tried the case in the lower court under the "arbitrary and capricious" standard,[3] and that because of its reliance on that standard, it would be improper for us to review the case as if a different standard had been applicable. We will assume, without deciding, that Benefit Trust is correct in this regard, although we have substantial doubt that it is. Among other reasons, we see little chance that Benefit Trust was prejudiced by any reliance on the more stringent standard of review.

For purposes of this appeal, therefore, we will review the district court's decision on the assumption that it was required to determine whether Benefit Trust's denial of Kunin's claim for benefits was arbitrary

and capricious. In doing so we, like the district court, will ignore Benefit Trust's conflict of interest.

### 2. *Reviewing the District Court's Findings*

We next consider under what standards we review the district court's determinations. The district court's finding that "mental illness," as that term is commonly understood, does not include autism was based on substantial testimony from expert witnesses as to the meaning or scope of that term. Accordingly, that finding constitutes a finding of fact, reviewed by this court under the clearly erroneous standard. *United States v. McConney,* 728 F.2d 1195, 1200 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The conclusion that denial of coverage was arbitrary and capricious followed a full examination of the facts and circumstances underlying that determination and was essentially fact governed. Thus the mixed question of fact and law presented here, unlike most such questions, is also reviewed under the clearly erroneous standard. *Id.* at 1202. However, in this case, the question whether the term "mental illness" is ambiguous can be answered by an examination of the words of the policy alone. The district court's implied finding of ambiguity does not fall under any of the exceptions to the general rule that mixed questions of fact and law are reviewed *de novo. Id.* at 1203–04. Therefore, we review that finding under the nondeferential *de novo* standard.

### B. The Medical Director's Opinion

 The district court found that Benefit Trust acted unreasonably in determining that autism was a "mental illness," and therefore the decision to deny benefits was arbitrary and capricious. We agree with this result.

The evidence that Benefit Trust's medical director gathered provided an altogeth-

---

**3.** Benefit Trust points to the pre-trial conference order, which states the relevant inquiry as "[w]hether the condition for which plaintiff's dependent, Alex Kunin, was examined and treated in approximately August of 1986 can be *reasonably considered* to be "mental illness or nervous disorders" (emphasis added).

er inadequate basis for determining autism to be a mental illness. The record does not indicate that the doctors with whom the medical director consulted had any significant experience with or particular expertise concerning autism. Moreover, the director made no effort to discuss the matter with Alex Kunin's physicians, who later unequivocally testified that autism is not a mental illness. Additionally, the textbook definition Dr. Zolot relied on states that although autism was previously thought to be "primarily psychiatric, it is now thought to be organically based." On its face, this definition contains no conclusions about whether autism should be classified as a mental illness. If anything, the fact that autism is no longer considered "primarily psychiatric" suggests that autism *is not* a mental illness.

State-law cases have differed in their classification of organically based diseases like autism as mental illnesses. In *Arkansas Blue Cross & Blue Shield, Inc. v. Doe*, 22 Ark.App. 89, 733 S.W.2d 429 (1987) (en banc), the Court of Appeals of Arkansas found that classifying bipolar affective disorder (formerly manic-depressive disorder) by cause rather than by symptom was proper. Because its cause was physical (organic), the disorder was held to be not subject to the policy's mental illness limitations.

Alternatively, in *Equitable Life Assurance Society v. Berry*, 212 Cal.App.3d 832, 260 Cal.Rptr. 819 (1989), a California court of appeals held that medical expenses incurred for the treatment of manic-depressive illness were not covered by an insurance policy that excluded coverage for "mental or nervous disorders." Equitable's expert testified that most serious psychiatric problems, including manic-depression, are caused by physiological disease processes. The witness further testified that the only problems that would fall into the "functional" category (what Drs. Freeman and Ritvo characterize as "envi-

ronmentally induced") would be marital disorders, substance abuse, and other problems caused by "the complications of our industrial society." 260 Cal.Rptr. at 824. In *Equitable*, the court held that *manifestation, not cause*, provides the "yardstick" by which one determines whether a mental disorder occurs. It therefore rejected the organic/functional distinction as a basis of determining coverage.

We conclude that Dr. Zolot's inadequate investigation did not provide a reasonable basis for making a determination that autism is a mental illness.[4] This result is amply supported by the weight of the evidence adduced at trial. Drs. Ritvo and Freeman testified that mental illness "refers to a behavioral disturbance with no demonstrable organic or physical basis.... [It] stems from reaction to environmental conditions as distinguished from organic causes. Thus ... autism would clearly fall outside the aforesaid criteria and factors for mental illness." 696 F.Supp. at 1346. The district court agreed with this analysis. It noted autism's prevalence throughout the world and that its incidence and characteristics remain constant across socio-cultural environments. Moreover, it noted that autism cannot be treated by traditional methods of psychotherapy. *Id.* at 1347. The court's observations are wholly consistent with the conclusion of Drs. Ritvo and Freeman that autism is not a mental illness, in either the lay or the technical sense. The doctors' testimony, in turn, supports the district court's finding that the defendant's inclusion of autism within the policy's limitation clause was unreasonable. We therefore conclude that the district court's holding that the denial of benefits was arbitrary and capricious was not clearly erroneous.

### C. Ambiguity in the Language of the Policy Exclusion

According to the law of California[5] and, indeed, every other state as well as the

---

**4.** The administrator's decision predated *Equitable* by more than two years. Therefore, Dr. Zolot could not have relied on that case in reaching his conclusion.

**5.** See *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal.3d 94, 101–02, 514 P.2d 123, 109 Cal.Rptr. 811 (1973).

District of Columbia,[6] ambiguities in insurance contracts must be construed against the insurer. This rule of *contra proferentem* has been called "the most familiar expression in the reports of insurance cases." 2 G. Couch *et al., supra* note 6, § 15:74, at 334. A typical statement of the rule is that if, after applying the normal principles of contractual construction,

> the insurance contract is fairly susceptible of two different interpretations, another rule of construction will be applied: the interpretation that is most favorable to the insured will be adopted. The rule is based upon the principle of contract construction that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter.

A. Windt, *supra* note 6, § 6.02, at 281–82 (footnote omitted). Because we find the language of the limitation in question to be ambiguous, we hold in favor of coverage on the alternative ground that Benefit Trust, in its capacity as insurer, did not properly construe the ambiguities in its policy in Kunin's favor.

■ Of course, neither the law of California nor that of any other state[7] is applicable here of its own force. The group health and medical policy that covers Kunin is an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002(1); section 502 of ERISA, rather than state contract law, provides the legal basis for Kunin's claim. However, "[c]ontroversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules." *United States v. Kimbell Foods*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979). State law can sometimes control such controversies, either because Congress intends courts to look to state law, or because the incorporation of state law into the federal common law is "appropriate as a matter of judicial policy under the three-part test established by *Kimbell Foods*." *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1458 (9th Cir.1986).

■ There is room for disagreement as to whether a uniform federal rule of construction applies when we construe an ambiguous provision in an ERISA insurance contract or whether the applicable state rule of construction is incorporated into federal law for that purpose.[8] However,

---

**6.** See 2 G. Couch, R. Anderson, and M. Rhodes, *Couch on Insurance 2d*, § 15:83, at 399 n. 4 (rev. ed. 1984) (citing cases from the District of Columbia and 47 states, with no cases cited for a contrary position); 13 J. Appleman & J. Appleman, *Insurance Law and Practice* § 7401, at 197 n. 1 (rev. ed. 1976 & Supp.1989) (citing cases from the District of Columbia and 48 states, including the three not included in the 47 listed in Couch, with no cases cited for a contrary position). *See also* A. Windt, *Insurance Claims and Disputes* § 6.02, at 286 (2d ed. 1988) (stating that "the rule favoring coverage will be applied in all jurisdictions").

**7.** In discussing the construction of insurance contracts, Benefit Trust cites only California law. However, because Maxim's is a Minnesota corporation and the plaintiff is a resident of Minnesota, we note that Minnesota law is to the same effect. *Hubred v. Control Data Corp.*, 442 N.W.2d 308 (Minn.1989). Without deciding the question, we therefore indulge in Benefit Trust's tacit assumption that if any state's law controls, it is the law of California.

**8.** Briefly stated, the controversy revolves in substantial part around the effect of ERISA's pre-emption provisions, which provide the most probative evidence of Congress's intention regarding choice of law under ERISA (even though this is not a preemption case). Section 514(a) provides in sweeping terms for the preemption of "any and all State laws insofar as they may now or hereafter *relate to any employee benefit plan.*" 29 U.S.C. § 1144(a) (emphasis added). However, Congress also enacted an "insurance saving clause" in § 514(b)(2)(A), which states that with one exception not relevant here, "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which *regulates insurance....*" 29 U.S.C. § 1144(b)(2)(A) (emphasis added). Although the breadth of § 514(a) leaves no doubt about the importance Congress attached to the federal interests involved, it seems equally clear that Congress meant to leave *some* state laws regulating insurance contracts intact—even though they may also "relate to" ERISA plans. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 746–47, 105 S.Ct. 2380, 2392–93, 85 L.Ed.2d 728 (1985). However, both this court and others have had some difficulty in determining when a law "regulates insurance" for the purpose of this complex pre-emption analysis. *See, e.g., Pilot Life Ins. Co. v.*

we need not decide that question here, because the rule of *contra proferentem* would control in either event. As we noted above, the *contra proferentem* rule is followed in all fifty states and the District of Columbia, and with good reason. Insurance policies are almost always drafted by specialists employed by the insurer. In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence. Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees an ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament. Were we to promulgate a federal rule, we would find these common-sense rationales sound. Indeed, it would take a certain degree of arrogance to controvert an opinion held with such unanimity in the various states and to adopt a contrary view as the federal rule. We hold, therefore, that the rule of *contra proferentem* applies to the case at bar, regardless of whether it applies as a matter of uniform federal law or because federal law incorporates state law on this point.

Benefit Trust points out additionally that in some instances this court has declined to apply the rule of *contra proferentem* in ERISA cases. *See, e.g., Jung v. FMC Corp.,* 755 F.2d 708, 713 (9th Cir.1985); *Smith v. CMTA–IAM Pension Trust,* 654 F.2d 650, 655 (9th Cir.1981); *Rehmar v. Smith,* 555 F.2d 1362, 1369 (9th Cir.1976). As Benefit Trust concedes, however, those cases involved language that resulted from collective bargaining; Benefit Trust does not even suggest that this is such a case. Indeed, the district court found that the insurer was solely responsible for drafting the language at issue here. 696 F.Supp. at 1343.

Benefit Trust does argue, however, that *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), effectively abolished the rule of *contra proferentem* for *all* ERISA plans. Benefit Trust is supported on this point by the Health Insurance Association of America and the American Council of Life Insurance, appearing as *amici curiae.* Benefit Trust and the *amici* point to the *Firestone* Court's adoption of "settled principles of trust law," which require courts to "construe terms in trust agreements without deferring to either party's interpretation." 489 U.S. at ——, 109 S.Ct. at 955. We are thus asked to conclude that trust-law principles leave no room for the rule of *contra proferentem* in ERISA cases. We decline to do so.

Even if we overlook the considerable irony involved in Benefit Trust's attempt to

*Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding that Mississippi's cause of action for tortious breach of a covenant of good faith and fair dealing is not a law "which regulates insurance," and is thus preempted by ERISA); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 744, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985) (holding that a state law requiring insurers to provide certain benefits "regulates insurance" and is therefore not preempted; and suggesting along the way that the interpretation *of an insurance policy* is at "the core of the 'business of insurance,'" (emphasis added) (quoting *SEC v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969)); *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989) (relying on *Pilot Life* and

holding that "California's common law of contract interpretation" is preempted in a suit founded exclusively upon state law); *McMahan v. New England Mut. Life Ins. Co.,* 888 F.2d 426, 429–30 (6th Cir.1989) (following *Kanne* and holding that because Kentucky's rule of *contra proferentem* is a rule of general contract law rather than a law "which regulates insurance," state decisions applying that rule do not provide an independent state-law cause of action that escapes ERISA preemption, but not considering the content of federal common law). Moreover, if we were to determine that the *Kimbell Foods* test controls, there is ample room for disagreement as to whether the application of those standards in the case before us would result in the adoption of a uniform federal rule or the incorporation of each state's law. *See Mardan Corp.,* 804 F.2d at 1458–60.

invoke the *dicta* of *Firestone* while asking us not to apply its holding, we do not read *Firestone* as broadly as we are urged. In that case, as we explained earlier, the Supreme Court was discussing the standard according to which courts should review a plan administrator's interpretation of plan provisions. The Court held that reviewing courts should interpret disputed provisions *de novo*, not defer to the administrator's interpretation. The Court said nothing whatsoever about the ordinary principles of construction according to which courts and administrators alike should arrive at their interpretations. Benefit Trust and the *amici* thus misread *Firestone* because they fail to distinguish between (1) using certain presumptions, including presumptions in favor of a party, in order to arrive at the correct interpretation, and (2) deferring to a particular party's interpretation. Rejecting (2) obviously does not undermine the soundness of (1). We might say, for example, that a jury should not defer to a defendant's plea of "not guilty"—we want the jury to determine his guilt or innocence *de novo*. However, this in no way implies that the jury, in making this determination, is not required to *presume* innocence—and indeed, to presume it quite strongly. Again, we might say that a baseball umpire should not defer to a baserunner's claim that he is safe; but this proposition is fully consistent with the separate rule that ties go the runner. Likewise, while we may not defer to an insured's construction, we must not fail to indulge in a presumption that ambiguous language favors the insured.

This common-sense view of the matter is supported by *Firestone* itself. The Court there noted, "The trust law *de novo* standard of review is consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA[, when] [a]ctions challenging an employer's denial of benefits [were] governed by principles of contract law." 489 U.S. at ——, 109 S.Ct. at 955. It is, then, quite plain

that the *Firestone* Court intended no wholesale rejection of prevailing principles of plan interpretation when it looked to trust law on the subject of the appropriate standard of judicial review.

■ It remains only for us to determine if the meaning of the term "mental illness" is so clear and well fixed that an ordinary reader of the policy would recognize that autism must be included. If not, in light of the rule that ambiguities in the policy must be construed against the insurer, Kunin must prevail. A plain reading of the language tells us beyond any question that "mental illness" is ambiguous, at least insofar as autism is concerned. The policy contains no definition or explanation of the term "mental illness," and offers no illustration of the conditions that are included or excluded. Nor does the policy contain any language suggesting whether the cause or the manifestation determines whether an illness is covered; yet in the case of autism the answer to that question may well be determinative. Here, the failure of the policy to define its terms is fatal to the insurer's attempt to limit payment.

Insurance contracts generally spell out in inordinate detail the meaning of terms that lack a fixed meaning. Great efforts are ordinarily made to eliminate the natural ambiguity that exists in so many of the words and phrases we use daily. In this policy, however, Benefit Trust made no attempt whatsoever to describe the scope of a term that has no precise or generally accepted definition. Under these circumstances, we conclude that the term "mental illness" is ambiguous. The vague evidence on which Benefit Trust's medical director based his determination, and the evidence in the form of opinion testimony offered by Alex Kunin's doctors, strongly support our conclusion. Thus, we hold that Benefit Trust erred in failing to construe the ambiguity in favor of the insured.[9]

9. In *Equitable Life Assurance Soc'y v. Berry*, 212 Cal.App.3d 832, 260 Cal.Rptr. 819 (Ct.App.1989), a California court recently ruled against a claimant in a case with some substantial similarities to the one before us. In *Equitable* the illness was manic-depression; however, the reasoning of the opinion appears to conflict in some respects with the basic view we have expressed. On the other hand the *Equitable* policy, unlike the one before us, defined "[m]ental or nervous treatment" in a manner that may well have covered the treatment involved; fur-

For the two alternative reasons discussed above, the decision of the district court is

AFFIRMED.

thermore, the testimony of the experts in that case was of a wholly different order. In any event, we simply do not believe that the meaning of the bare, unexplained term "mental illness" is so plain and clear that the ordinary citizen would understand that *autism,* as opposed to manic-depression, is excluded from full coverage under the policy.