**Jeffrey McCONOCHA, et al., Plaintiffs,**

**v.**

**BLUE CROSS AND BLUE SHIELD OF OHIO, Defendant.**

**No. 3:93CV7534.**

United States District Court, N.D. Ohio, Western Division.

Aug. 29, 1995.

Dennis E. Murray, Sr. and Kirk J. Delli Bovi, Murray & Murray, Sandusky, OH, and Marvin L. Karp, Ulmer & Berne, Cleveland, OH, for plaintiffs.

Paul S. Lefkowitz, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, OH, Fritz Byers, Toledo, OH, and Troy L. Moore, Scott, Ballinger & Moore, Toledo, OH, for defendant.

### MEMORANDUM & ORDER

CARR, District Judge.

This is a case under the Employee Retirement Income Security Act of 1974 as amended (ERISA). Plaintiffs assert claims for benefits under 29 U.S.C. § 1132(a)(1)(B) and breach of fiduciary duties under 29 U.S.C. §§ 1109(a) and 1106(b). Pending are defendant's motion to strike and cross-motions for summary judgment.

For the following reasons, the motion to strike shall be overruled as moot, plaintiffs' motion for summary judgment shall be granted, and defendant's motion for summary judgment shall be denied.

A status conference to set a timetable for further proceedings and to discuss such other matters as the parties may desire shall be held on Monday, September 18, 1995, at 1:30 p.m. The parties shall submit, and do so jointly if possible, an agenda two days prior to that conference.

#### A. Factual Background

In July, 1988, plaintiff McConocha, president and 80% shareholder of plaintiff ISDN, purchased group health insurance from the defendant Blue Cross and Blue Shield of Ohio (BCBSO). As described in the Subscriber Certificates (Doc. 81, exh. 8), BCBSO sends the beneficiary an "Explanation of

Benefits" (EOB) after the beneficiary has received hospital services. In this case, plaintiffs received EOBs after they had obtained hospital services (Docs. 65, 64; exhs. JJ, GG). The EOBs informed plaintiffs that they were obligated for 20% of the hospitals' charges.

That obligation derived from the Schedule of Benefits in the Certificate (Doc. 81, Exh. 8, p. 2). Pursuant to that schedule, BCBSO agreed to pay "80% of the Provider's Reasonable Charge" and plaintiffs were to copay the remaining 20%.

Unbeknownst to plaintiffs, BCBSO negotiates with the hospitals which provide services to the beneficiaries of its insurance programs to pay less than 80% of the total amount of the charges. The percentage of the charges ultimately paid by BCBSO varies from hospital to hospital and from service to service.[1] As a result of the discount given to BCBSO, plaintiffs paid more than 20% of the amounts actually received by the hospitals for the services provided to plaintiffs.

For example, Engel incurred a $4,764.34 bill at Marymount Hospital in 1990 (Doc. 65, exh. JJ). After deducting $1.50 for a phone call, which is not a charge covered by defendant, Engel's allowed charges were $4762.84; he paid 20% of this amount, or $952.57, to Marymount.

■ Pursuant to its discount agreement with Marymount, BCBSO paid Marymount $1,100.84. No one paid, or, as a result of the discount agreement, was obligated to pay Marymount the remainder ($2,709.43).[2] Engel, consequently, paid 46.4% of the total amount received by Marymount.

BCBSO points out that the premiums paid by the purchasers of its insurance may be lowered as a result of the reduction in the amounts which it pays to the hospitals. If, as with McConocha, the beneficiary is also the purchaser of the insurance, he or she may also benefit from any premium reduction flowing from BCBSO's discounted payments. In most instances, however, an employer pays most or all the premium, and the individual employee benefits not at all, or only to a very modest extent, from any premium reduction.

The ability to charge a lower premium benefits BCBSO: the lower its premiums, the greater its competitiveness in the market place, and the more insurance it is able to sell. To the extent that the discount program leads to lower premiums, beneficiaries who pay more than 20% of the total amount received by the hospitals unknowingly subsidize BCBSO's competitiveness.

### B. Defendant's Motion to Strike

BCBSO seeks to strike some of the exhibits attached to plaintiffs' motion for summary judgment on the basis that they are either unauthenticated, hearsay, or irrelevant. Plaintiffs state that the challenged materials were provided merely as "context," not as evidence, and that they should have the chance to authenticate the public records.

Rather than undertake the time consuming project of ruling on each of the challenged items one-by-one, I have simply disregarded them during the course of adjudicating the pending motions. Because I have disregarded the challenged materials, defendant's motion to strike shall be overruled as moot.

### C. Plaintiffs' Claim for Unpaid Benefits

#### 1. Standing

■ BCBSO argues that McConocha does not have standing to assert an ERISA claim

---

1. According to BCBSO, hospitals enter into such discount agreements, and thereby receive less than their stated charges, because they derive the benefits of increased patient volume, assured collectability of bills, and improved cash flow. This explanation of the discount program's purposes and consequences relates solely to the motives for and benefits from the acceptance of discounts by the hospitals.

2. BCBSO argues that the remaining $2,709.43 also was "paid," although no money was exchanged and the hospital simply discharged this amount according to its agreement with BCBSO.

The provision in the schedule of benefits, however, is unambiguous: BCBSO agrees to pay 80% of plaintiffs' medical costs. At no point in the Certificate or EOB does BCBSO indicate that "pay" means more than a monetary payment. While construing similar provisions, the court in *White v. Blue Cross & Blue Shield United of Wisconsin,* 1995 WL 465845 *2–3 (Wis.Cir.), found that "pay" meant solely monetary payment. I agree. Because BCBSO did not satisfy the discharged amounts by monetary payment, it paid less than it contractually agreed to pay on plaintiffs' behalf.

because he is not an "employee" of an employer with an ERISA plan. That argument was answered to my satisfaction in *Madonia v. Blue Cross & Blue Shield of Virginia*, 11 F.3d 444, 445 (4th Cir.1993), in which the Fourth Circuit held that a sole shareholder, insured under a health policy purchased by his corporation, was a "participant" in the company's ERISA plan. Because BCBSO does not dispute that McConocha is covered under the group health insurance plan maintained by ISDN, he has standing to assert an ERISA claim.

BCBSO also alleges that McConocha and Engel cannot prove a necessary predicate to their claim, namely that they paid their copayments. Defendant bases this argument on plaintiffs' desire to be refunded the difference between copayments paid at 20% of the 'provider's actual bill' and 20% of the 'charges after the discount.' According to BCBSO, there is no recoverable 'difference' in the absence of actual payment. Because McConocha and Engel have submitted affidavits stating that they paid copayments, I conclude that they satisfy the requirements for bringing their claims.

### 2. Merits

■ At the heart of this case are two competing constructions of the Certificate, which is the contract between plaintiffs and BCBSO. BCBSO contends that the Certificate's language allows it to negotiate discounts without disclosing to plaintiffs that it is doing so; plaintiffs argue the opposite. In my Memorandum & Order of June 15, 1994 (Doc. 46), I concluded that, due to its ambiguity, the Certificate is susceptible to either party's construction:

> In a section entitled "How Claims Are Paid," the Certificate states that the "*amount* of copayment ... [is] specified in the Schedule of Benefits" [emphasis added]. However the Schedule of Benefits states only the percentage of charges which BCBSO will pay. When these provisions are read in conjunction with each other, it is not unreasonable to conclude that if BCBSO will pay eighty percent of the provider's reasonable charge, then the insured's copayment will be twenty percent of that same charge. Nor is it unreasonable to conclude that the agreement referred to in the definition of the "provider's reasonable charge" includes the discount agreements at issue. Under this interpretation, the copayment would be based upon charges after the discount.

Defendant, on the other hand, argues that "copayment," as referred to in the Certificate, can only be interpreted as being based upon the provider's actual bill and that the "provider's reasonable charge" does not include any agreed upon discounts. Defendant makes this argument despite the fact that the Certificate contains no language informing the insured of discounts BCBSO may negotiate nor any explanation that benefits and copayments will be based on charges without regard to any discounts. This Court finds that the Certificate read alone is fairly susceptible to both plaintiffs' and defendant's interpretations.

BCBSO contends that this ambiguity should be resolved to correspond to the parties' original intentions. According to BCBSO, the method of copayment calculation conforms to the contract's language and parties' expectations.

This argument rests to a considerable extent on brief and conclusory statements by each plaintiff during his deposition. McConocha stated that, "it was my understanding ... that I was responsible for twenty percent of the bill ... that I received" and "my copayment was 20% of the bill, of at least 20% of what was at least covered." (McConocha Dep. at 56–7, 81). Engel likewise answered affirmatively ("Sure") when asked if he "expected that [his] co-payment was going to be 20% of allowed charges." (Engel Dep. at 36).

These statements, according to defendant, constitute "extrinsic evidence that discloses that the plaintiffs always intended, expected and understood that their copayments would be calculated in the *precise fashion* that BCBSO actually calculated them"—*i.e.*, "'upon the provider's actual bill' and *not* 'upon charges after the discount.'" (Doc. 81 at 10).

I do not find that these conclusory statements express such understanding or assent that plaintiffs can be viewed as having contemplated or concurred in the consequences

of the discount program: namely, that they would pay more than 20% of the money paid to the hospital for its services. Defendant's argument presumes a degree of comprehension about the operation of the Plan that cannot, in view of plaintiffs' ignorance of the discounts, be ascribed to them. Accordingly, I reject defendant's argument that the contract's ambiguities can be resolved through reference to the parties' shared expectations: because the defendant alone was aware of the Plan's operation and practical consequence, it alone was able to formulate an accurate expectation about how it would be implemented.

Because the Certificate cannot be construed on the basis of the parties mutual expectations, two doctrines of contract construction may be applied to resolve its ambiguous nature. The ambiguity can be resolved either by applying the rule of *contra proferentum* (by which the Certificate would be construed against its drafter), or on the basis of the plaintiffs' reasonable expectations. *See Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 411 (9th Cir. 1995). These rules of construction are "tiebreakers." *Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 313 (7th Cir.1992).

The doctrine of construing insurance contracts against their drafters arises out of a concern for fairness, particularly in light of the disparity of expertise and resources between insurers and insureds. As noted in Couch on Insurance 2d § 15:78 (1984):

> It is commonly stated that the reason for the rule of construction against the insurer is that policies of insurance are made on printed forms carefully prepared in the light of wide experience, by experts employed by the insurer, and in the preparation of which the insured has no voice.

In the context of insurance plans governed by ERISA, courts have consistently construed ambiguous contracts against insurers. *See Peterson, supra,* 48 F.3d at 411; *McNeilly v. Bankers United Life Assur. Co.*, 999 F.2d 1199, 1201 (7th Cir.1993) (construing ERISA plan strictly in favor of insured when insurer drafted plan without input from insured).

Because, as held in my earlier decision, the description in the Certificate regarding computation of plaintiffs' copayments is ambiguous, it must be construed against BCBSO. Hence, BCBSO is required by the Certificate to pay 80% of the total amount received by the hospital, and plaintiffs are obligated for 20% of that amount.

■ Plaintiffs likewise prevail upon application of the doctrine of reasonable expectations, which provides that limitations on an insurance company's liability should be set forth clearly enough for nonlawyers to understand. *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir.1990). This doctrine applies as a principle of federal common law to ERISA-governed insurance contracts. *See Peterson, supra,* 48 F.3d at 411; *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 387 (9th Cir.1994). In *Saltarelli,* a group health plan declined coverage under a pre-existing condition exclusion. The exclusion, however, was buried among definitions rather than being set forth in the plan description. The Ninth Circuit held that because the exclusion was not clear, plain, and conspicuous enough to negate the claimant's objectively reasonable expectations of coverage, it was not enforceable. *Id.*

The reasonable expectations analysis, I conclude, is equally applicable in this case, which likewise involves issues regarding the extent of coverage. Plaintiffs had no reason to know from the Certificate or EOBs that BCBSO was paying less than 80% of the hospital's charge as stated on the EOB. They had no way of knowing that the charge reflected in the EOB overstated the amount that, as BCBSO and the hospital were well aware, the hospital would be receiving. The plaintiffs' expectation that they would pay no more than 20% of the amount actually to be received by the hospital was not only reasonable—it was the only expectation the plaintiffs could have had.

Aside from the doctrines of *contra proferentum* and the insured's reasonable expectations, a close examination of the contracts between 1) plaintiffs and BCBSO and 2) BCBSO and the hospitals reveals that the discounting scheme does not conform to the language of those agreements. The precise language of the contracts creates the impression that there is a single list of charges that applies to all payors, including patients and

insurers. Due to the operation of BCBSO's undisclosed discount scheme, that impression, however, is inaccurate.

The Certificate defines copayment as a percentage of the "provider's reasonable charge for covered services" as established between BCBSO and the hospital. This language is repeated in the agreement between BCBSO and the hospital, which provides that the term "covered hospital service charges" is synonymous with the "provider's reasonable charge for covered services."

The contract between BCBSO and the hospital states further that the "covered hospital service charges" are found on "the Hospital's master charge list uniformly applicable to all payors." The effect of these provisions, after reading first the Certificate and then the BCBSO-hospital contract, is that the copayment is computed on the basis of a "master charge list uniformly applicable to *all* payors" (emphasis supplied).

As a result of the discount agreement, there is, however, no single "master charge list uniformly applicable to all payors." Though there is a "master charge list," it is applicable only to the patient. Through operation of the discount agreement, BCBSO pays some other amount, which is a percentage, or a fraction, of the amount stated on the "master charge list."

Even if, as BCBSO states in its supplemental brief, there is no second "master charge list" setting forth the amounts actually paid by it (i.e., through operation of the discount agreement), the result is the same: there is no "master charge list uniformly applicable to all payors" because some payors—the patients—pay the full amount of their obligation, while another payor—BCBSO—pays only that portion of the "master charge" that it and the hospital have agreed it is to pay.

The "master charge list," in other words, is in practice simply used as the basis for computing the copay obligation. Because there is, as a result of the separately negotiated discounts for each of the services listed on the "master charge list," no single list of charges that is uniformly applicable to all payors, BCBSO's discount system is not, and cannot be consistent with the expectations that otherwise result from a reading of the pertinent language of the Plan and related documents.

Because each of these approaches leads to the same result (namely, the plaintiffs could not be charged on the basis of the pre-discount charge), plaintiffs' contract with BCBSO is to be construed to require that plaintiffs' copayments should have been computed on the basis of the amounts actually received by the hospitals.

I conclude, accordingly, that BCBSO is liable to plaintiffs for the difference between the amount they copaid to the hospitals and 20% of the total amount received by the hospitals. Even though BCBSO did not receive the monies paid by the plaintiffs, which went to the hospitals, it is proper to require it to pay damages, because: 1) BCBSO played an active role for its own benefit (*i.e.,* being able to charge lower premiums and thus get more business) in negotiating the discounts; 2) it failed to tell the plaintiffs about the actual percentages they were being required to pay due to of the discounts; and 3) its actions caused economic harm to the plaintiffs.[3]

### D. Breach of Fiduciary Duty Claim

Because I already have determined that defendant, as an insurance company administering claims for an employee welfare benefit plan, is an ERISA fiduciary, the only remaining issues are: 1) whether plaintiffs have standing to bring a claim for equitable relief; 2) whether defendant breached a duty to plaintiffs by not informing them of its practice of computing copayments before applying the discounts to the hospital charges; and 3) what remedies for this breach are available to plaintiffs. Due to the uncertain nature of available remedies, I will address and resolve only the first two issues.

---

**3.** This result is similar to that reached in Restatement (Second) of Contracts § 305 (1981) comment a, illustration 2:

> A owes C an unliquidated sum. In consideration of $100 paid to B by A, B promises A to pay C whatever is due. B breaks his promise,

and A pays C a reasonable sum in discharge of C's claim. A can at his election recover from B either $100 or the amount paid C.

In the present case, BCBSO promised, in return for premiums, to pay 80% of whatever plaintiffs owed to the hospitals. When plaintiffs, by pay-

### 1. Standing

■ Regarding McConocha and Engel, BCBSO argues that they are not entitled to bring the ERISA action because their only available remedy is in equity,[4] and their "unclean hands" bar them from receiving equitable relief. According to defendant, McConocha and Engel do not qualify for equitable relief because Engel was listed as an employee for benefits purposes for six months after he left ISDN.

In light of McConocha's unchallenged statement, however, that defendant told him that ISDN could carry Engel under its health plan for six months after he left the company, I conclude that neither McConocha nor Engel has acted in an inequitable manner or is precluded from obtaining equitable relief.

As to defendant's argument that plaintiff ISDN, suing in its capacity as plan administrator, does not have standing because it has not suffered any harm in the form of higher premiums, I decline, in the absence of further briefing on the issue of whether ISDN's premiums are affected by BCBSO's discounting scheme, to address this issue.

### 2. Merits

■ Plaintiffs contend that the focus of this analysis should be the alleged wrongfulness of defendant's conduct. According to plaintiffs, defendant, as a fiduciary, had a duty not to misinform plaintiffs about the actual percentage of their copayment. I agree.

■ A fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed. *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir.1988). Fiduciaries must: inform participants of existing benefits, *see Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 751 (D.C.Cir.1990); disclose circumstances that threaten the funding of benefits, *see, Dellacava v. Painters Pension Fund*, 851 F.2d 22, 27 (2nd Cir.1988);

and not affirmatively misrepresent potential benefits. *See Berlin, supra,* 858 F.2d at 1164.

BCBSO violated its duty not to mislead plaintiffs when it failed to inform plaintiffs about the discounts and their impact on the percentage of the copay obligation. The presence of a discounting scheme which increases the copay percentage is a material fact about which plaintiffs should have been told. *See Drennan v. General Motors Corp.*, 977 F.2d 246, 251 (6th Cir.1992) (fiduciaries have a duty to disclose material matters). BCBSO's silence was contrary to its fiduciary duty to ensure that its subscribers were informed about the true nature, extent, and significance of their copay obligation.

In addition to causing the plaintiffs unknowingly to pay more than they expected, BCBSO's nondisclosure of the discount scheme reduced the plaintiff's ability to make an informed decision about the desirability of the decision by ISDN to buy BCBSO insurance. Had plaintiffs known the true percentage of the copay obligation, they might have sought to have ISDN look elsewhere for insurance that was more favorable to them, even if more expensive for ISDN. This protected BCBSO's market position at the expense of the two plaintiffs and violated its fiduciary duty under § 1104(a)(1) of ERISA to act "solely in the interest of the participants and beneficiaries."

■ BCBSO also breached its fiduciary obligation under § 1104(a)(1) when it used the discount program in a manner that imposed a greater, and undisclosed, proportion of the overall obligation on the plaintiffs. To the extent that BCBSO lowered its premiums by paying not only less, but a lesser percentage as well, it enhanced its position in the marketplace. Such self-enhancement violated § 1104(a)(1).

I reject BCBSO's claim that its duty to inform was met as long as it did not lie when asked a direct question: "A fiduciary duty claim can, therefore, be predicated only upon

---

ing more than 20% of the total amount received by the hospitals, paid a portion of the money which BCBSO had promised to pay on their behalf, they became entitled to recover from BCBSO the amount of money which BCBSO should have paid but did not.

4. In my Memorandum & Order of June 15, 1994 (Doc. 46), I found that monetary relief for plaintiffs McConocha and Engel was not available in their suit for breach of fiduciary duty under 29 U.S.C. § 1109.

misinformation (causing harm) in response to a specific inquiry" (Doc. 89, pp. 22–23). BCBSO constructed, implemented, and concealed its discount program in a manner that caused financial harm to the plaintiffs, reduced its own costs, and improved or protected its market position. Its fiduciary duties went beyond its narrow and incomplete understanding that fair dealing meant not lying when confronted with a direct question.

In a factually similar case, *Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Company,* 698 F.2d 320 (7th Cir.1983), the Seventh Circuit held that the defendant's omission of the fact that it was earning higher interest on the plaintiff's money than it was reporting to the plaintiff would be a breach of defendant's fiduciary duty. The same is true in the present case: BCBSO could not lawfully self-deal by negotiating discounts which reduced its expenses without, at least, informing plaintiffs that it was doing so.

For the reasons stated above,

**IT IS ORDERED THAT:**

1) Plaintiffs' motion for summary judgment be, and the same hereby is, granted as to:

    a) McConocha and Engel's claim that BCBSO is liable for unpaid benefits, and

    b) McConocha and Engel's claim that BCBSO is liable for breach of fiduciary duty; and

2) Defendant's motion for summary judgment be denied as to McConocha and Engel; ruling to be held in abeyance as to plaintiff ISDN's standing; and

3) Defendant's motion to strike be overruled as moot; and

4) A status conference is to be held on Monday, September 18, 1995, at 1:30 p.m.; agendas to be submitted two days prior to the conference.

**So ordered.**