LARRY R. MALERBI AND LINDA MALERBI, APPELLEES, V. CENTRAL RESERVE LIFE OF NORTH AMERICA INSURANCE COMPANY, APPELLANT.

407 N.W.2d 157

Filed June 5, 1987. No. 85-757.

Richard A. Rowland, for appellant.

Jeffrey A. Silver, for appellees.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, Shanahan, and Grant, JJ.

Boslaugh, J.

This action was brought by Larry R. and Linda Malerbi for benefits under a certificate of insurance issued by the defendant, Central Reserve Life of North America Insurance Company (hereinafter Central Reserve).

On October 1, 1982, Central Reserve issued a group insurance policy to Younglove Career Consultants, Inc. As a Younglove employee, Larry Malerbi and his dependents, including his stepson Bryan Buckley, were insured by the policy.

The policy included comprehensive major medical coverage, the purpose of which was to indemnify for major loss through accident or sickness.

On December 15, 1982, Bryan Buckley was hospitalized for inpatient treatment at the Nebraska Psychiatric Institute (NPI) in Omaha, Nebraska. This hospitalization was based on the recommendation of Dr. Jane Bottlinger, a psychiatrist, following psychological testing of Bryan. Also, prior to his hospitalization at NPI, a question arose regarding insurance coverage for Bryan's treatment. In a letter from Glenn Shipley, a general agent for Central Reserve, to Theodore Liapis, Central Reserve's director of technical claims service, Shipley indicated that the claim would be paid according to the cause of the treatment. If the cause was physiological, Central Reserve would pay as on any illness. If it was entirely psychological, benefits would be paid according to the limitations for psychological treatments. This information was relayed to the Malerbis by Theodore Lange, the representative who delivered the policy to the employer Younglove. In discussions with both the Malerbis and Lange, Dr. Bottlinger indicated the cause of Bryan's treatment was a physical problem.

An intake evaluation indicates Bryan was admitted on complaints of behavioral problems. As related by his mother at trial, Bryan's previous medical history included a series of hospitalizations in 1976, at the age of 5 years. Bryan was hospitalized then for an illness and fever of unknown etiology. He eventually developed hepatitis and became semicomatose. He also experienced his first seizures during this time. Eventually, he was diagnosed as having epilepsy and was still experiencing some seizures at the time of trial. Following his 1976 illnesses, Linda Malerbi noted a distinct change in her son's personality. Prior to this time, she had observed no significant behavior problems in Bryan.

Bryan was first treated as an outpatient by Dr. Bottlinger in 1980. He was then experiencing behavior problems at home and at school. In 1981 he received treatment from a neurologist for seizures. On his admission to NPI, Bryan was taking anticonvulsant medication.

During his hospitalization at NPI, Bryan was subjected to

many diagnostic tests, including an electroencephalogram (EEG) and a computerized axial tomography (CAT) scan. As a result of these tests and those of the Luria-Nebraska neuropsychological battery performed prior to Bryan's admission, Dr. Bottlinger testified that she formed an opinion, based upon a reasonable degree of medical certainty, that Bryan had a dysfunction in the temporal lobe region of his brain. Brain dysfunction in this case meant that there was something physically wrong with Bryan's brain. According to Dr. Bottlinger, the structural deficit in the temporal lobe of Bryan's brain was the cause of his epileptic seizures as well as his behavioral and emotional problems.

Dr. Bottlinger's final diagnosis as to Bryan Buckley was atypical organic brain syndrome with obsessive-compulsive features. She explained that organic brain syndrome involves impairment of behavioral or emotional functioning coupled with a physical brain dysfunction. The term organic indicates a physical etiology or cause. According to exhibit 14, 3 H. Kaplan, A. Freedman & B. Sadock, Comprehensive Textbook of Psychiatry/III (3d ed. 1980), a recognized text in the field of psychiatry, "When disturbed behavior is encountered in a child with evidence of neurological impairment, the diagnosis of brain damage is commonly regarded as constituting a sufficient cause for the psychiatric disorder." *Id.* at 2435. According to Dr. Bottlinger, and consistent with the above statement, Bryan Buckley's neurological problem was identified as a seizure disorder with evidence of some degree of temporal lobe brain structural damage.

Bryan's treatment at NPI included administration of the drug Haldol to address inappropriate behaviors, administration of the drug Tofranil for depression, behavior modification, emotional counseling, educational training, structured recreational activities, group therapy, individual therapy, and counseling for his parents. He was also treated by a neurologist. Dr. Bottlinger testified that because there was no surgery available to treat a brain dysfunction such as Bryan's, the only treatment approach available was to treat his symptoms.

During the course of his treatment a question of insurance

coverage again arose. Dr. Bottlinger was asked to clarify her diagnosis because some of the code numbers on Bryan's bills did not match the doctor's diagnosis. Dr. Bottlinger responded by sending a letter to Glenn Shipley of Group Sales Associates, the company that originally distributed the Central Reserve contract to Theodore Lange. In that August 17, 1983, letter, Dr. Bottlinger indicated that Bryan's diagnosis was organic brain syndrome (atypical) with obsessive-compulsive features. She also indicated that in her opinion, Bryan's emotional and behavioral problems were secondary to the neurological deficits identified.

Bryan was released from inpatient treatment on August 27, 1983. The evidence shows the Malerbis were billed a total of $41,865 by NPI and $5,735.35 by the Nebraska Clinicians' Group for charges related to his hospitalization. Central Reserve paid a total of $3,459.80 on these claims. Theodore Liapis testified that this amount was paid in accordance with limitation 19 of the Central Reserve policy, which limits benefits for the treatment or care of nervous, mental, or alcoholic conditions. The rest of the claim was denied, based on Central Reserve's view that the claim was for treatment of a mental condition. The bill from NPI also reflects that $7,500 was paid by Union Casualty Company. A Union major medical policy had been obtained by Linda Malerbi to insure Bryan, in August of 1981. At the time of trial, suit was pending by the Malerbis against Union for denial of their claim for the same hospitalization as involved in this case.

On January 5, 1984, the Malerbis filed their petition, in which they prayed for judgment against Central Reserve in the amount of $45,205.35, plus an attorney fee and the costs of the action. In its answer, Central Reserve affirmatively alleged that Larry Malerbi had been paid all claims due and owing on his claim under the terms of the policy in question. Trial was had to the court on July 8 and 9, 1985.

During the course of the trial, Central Reserve attempted to elicit testimony from Theodore Liapis regarding preexisting conditions. The court sustained the Malerbis' objection to this line of questioning on grounds that it was irrelevant and immaterial. Central Reserve's motion to amend its pleadings to

include preexisting condition as a defense was also denied.

Following submission of all the evidence, the trial court found that Bryan's bills were covered expenses under the policy and that it was premature to make a determination regarding coordination of benefits because there were no sufficient other final determinations as to the legal obligations under the Union policy.

Pursuant to these findings, the court entered judgment for the Malerbis and against Central Reserve in the amount of $43,318.13, plus an attorney fee of $14,000, plus other costs of the action. Central Reserve's motion for new trial was overruled, and it has appealed.

Two issues are raised by Central Reserve on appeal to this court: (1) whether the trial court erred in determining that the treatment and care of Bryan Buckley was not for a mental condition; and (2) whether the trial court erred in not considering specific clauses of the insurance contract, such as preexisting conditions and coordination of benefit insurance limitations.

Several clauses of the certificate of insurance are relevant to Central Reserve's first assignment of error.

> BENEFITS
>
> Comprehensive Major Medical is one policy which provides benefits for hospital, surgical and other medical expenses in an all inclusive insurance program. . . .
>
> COVERED EXPENSES
>
> Covered expenses include reasonable and customary charges actually incurred for necessary medical care and treatment for a non-occupational sickness or injury and recommended by a qualified physician. . . .
>
> . . . .
>
> LIMITATIONS
>
> Covered Expenses will not include and no benefits will be payable for expenses incurred:
>
> . . . .
>
> 19. in connection with treatment or care of nervous, mental or alcoholic conditions other than: (a) charges for administration of convulsive therapy; (b) charges incurred during hospital confinement as an in-patient; (c) charges

by a physician for professional psychiatric services provided that the maximum eligible charge per such visit is $20.00 (but limited to one visit per day); and (d) drugs and medicines which are otherwise considered eligible charges. Expenses (c) and (d) are subject to the annual deductible. The maximum payable under coverages (a), (b), (c) and (d) will be 50% of the eligible charges subject also to the maximum payable in any one calendar year of $2,000 for in-patient expenses and $550 for out-patient expenses.

. . . .

### DEFINITIONS

. . . .

6. The term "sickness" means physical sickness, disease, illness, bodily infirmity, mental illness or functional nervous disorder. A recurrent disability will be considered one disability. Concurrent disability will be considered one disability.

As previously stated, the trial court determined that Bryan's bills were covered expenses under the terms of the contract. This was based on the court's determinations that "mental condition," as used in the policy, required a finding of a primary psychological basis before Central Reserve could deny full coverage; that a preponderance of the evidence showed that Bryan's problem was primarily physical, and he was therefore not treated for a nervous or mental condition; that Bryan's problem was a sickness as defined by the policy; and that he had a physical injury to his brain which manifested itself through various forms.

On appeal, Central Reserve takes issue with the trial court's construction of the phrase "mental condition" as used in limitation 19. Central Reserve contends the term should be defined to include treatment for problems stemming from more than a psychological basis. The insurer argues further that the plain language of the contract was not so much concerned with the cause of the condition in limitation 19 as it was with whether the *treatment or care* was for a mental condition.

In support of these arguments, Central Reserve relies on evidence that Dr. Bottlinger, as well as Central Reserve's two expert witnesses, testified that the American Psychiatric

Association, Diagnostic and Statistical Manual of Mental Disorders (2d ed. 1968) (DSM-II) had defined organic brain syndrome as a mental condition. The full definition of organic brain syndrome in the DSM-II indicated that it was a mental condition resulting from diffuse impairment of brain tissue function from whatever cause. Central Reserve's psychiatric experts, Drs. Long and Aita, testified that the DSM-II language was outdated and, according to Dr. Long, was superseded as of 1980 in American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM-III). Dr. Bottlinger testified that Bryan had atypical organic brain syndrome, which is defined in DSM-III at 123 as

> a residual category reserved for syndromes that do not meet the criteria for any of the other Organic Brain Syndromes and in which there are maladaptive changes during the waking state with evidence, from either physical examination, laboratory tests, or history, of a specific organic [physical] factor that is judged to be etiologically related to the disturbance.

Dr. Bottlinger also testified that there is no special medical meaning attributed to the word "condition." She and the other two experts agreed that the phrases "mental disorder" and "mental illness" are synonymous. Dr. Long testified further that there is no difference between a mental condition and a mental disorder or illness. Because the experts saw no difference between the terms, Central Reserve contends that the cause of the problem precipitating treatment is irrelevant, apparently on grounds that the problems categorized in DSM-III are broadly classified as mental disorders, conditions, or illnesses.

Based on this interpretation of the limitation 19 language, Central Reserve maintains the evidence was insufficient to show that Bryan was treated for other than a mental condition.

An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. *Waylett v. United Servs. Auto. Assn.*, 224 Neb. 741, 401 N.W.2d 160 (1987). Where the terms of such a contract are clear, they are to be accorded their plain and ordinary meaning. *Waylett, supra*. On the other hand, where a clause in an

insurance contract can be fairly interpreted in more than one way, there is ambiguity to be resolved by the court as a matter of law. *Denis v. Woodmen Acc. & Life Co.*, 214 Neb. 495, 334 N.W.2d 463 (1983). Our rules of construction require that in the case of such ambiguities, the construction favorable to the insured prevails so as to afford coverage. *Denis, supra.* This rule has evolved from recognition of the fact that the insurer as drafter of the policy is responsible for the language creating the ambiguity. See, *Denis, supra; Dale Electronics, Inc. v. Federal Ins. Co.*, 205 Neb. 115, 286 N.W.2d 437 (1979).

The resolution of an ambiguity in a policy of insurance turns not on what the insurer intended the language to mean, but what a reasonable person in the position of the insured would have understood it to mean at the time the contract was made. *Denis, supra.*

Given the fact that all three experts agreed there was a possible organic (physical) basis for Bryan's problems, i.e., a structural deficit in the temporal lobe region of his brain, the Malerbis could reasonably have understood that treatment for a problem such as Bryan's would not be for a mental condition.

In *Sachs v. Commercial Insurance Co.*, 119 N.J. Super. 226, 290 A.2d 760 (1972), *aff'd* 124 N.J. Super. 258, 306 A.2d 83 (1973), the court addressed the issue of whether treatment for the insured's deteriorating intellectual powers caused by arteriosclerosis and amyotrophic lateral sclerosis fell within the meaning of a clause limiting coverage for mental illness or disorders. In concluding that the treatment was not for a mental illness or disorder, the court stated:

> It is reasonable to assume that the limitation was intended to delimit claims in cases of insanity or other degrees of mental aberration which are functional in origin. The public would not expect that such a limitation would control merely because the end result of an organic disease may affect the mental function of the individual.

*Sachs, supra* at 234, 290 A.2d at 764.

It is irrelevant that the experts characterized Bryan's diagnosis under DSM-II, a classification system utilized by psychiatrists, as a mental condition. As stated in *Prince v. U. S. Life Ins. Co.*, 42 Misc. 2d 410, 412, 248 N.Y.S.2d 336, 338

(1964), "[t]he average person is not familiar with mental disease from the strictly medical point of view—and a layman is not required to read his policy as if he were a psychiatrist."

In the instant case, there is evidence of the onset of Bryan's behavioral problems following his illness in 1976. The medical evidence suggested a structural deficit in his brain. With these facts in mind, the Malerbis could reasonably have concluded that Bryan's illness would be a covered expense.

Inconsistencies in the policy language also create ambiguity in the present situation. While mental illness is included within the definition of sickness, the treatment of which when nonoccupational is a covered expense, mental condition is subject to limited coverage. Neither mental illness nor mental condition are defined in the policy. How the terms relate is not clarified by the policy. As such, it is appropriate to interpret limitation 19 in favor of the Malerbis. It was Central Reserve's duty to draft the terms more precisely if it desired to limit its coverage.

On appeal from an action at law, this court will not reweigh the facts. Instead, the court is obligated to examine the evidence to determine whether, under a view most favorable to the successful party, the facts support the trial court's judgment. *Armstrong v. Hartford Life Ins. Co.*, 219 Neb. 128, 361 N.W.2d 511 (1985). There was considerable evidence in this case that Bryan required treatment for a physical condition. Central Reserve's experts both agreed with Dr. Bottlinger's diagnosis of organic brain syndrome. Both also agreed that the diagnosis involves a physical deficit in the brain. Dr. Bottlinger testified that in her opinion based on a reasonable degree of medical certainty, Bryan's behavior problems were a result of his brain dysfunction. She also testified that the charges incurred were customary and reasonable and that the treatment and care provided were medically necessary.

Taking the view most favorable to the Malerbis, the evidence was sufficient to support the trial court's judgment that Bryan's treatment and care were covered expenses and not subject to limitation 19 of the policy.

Central Reserve next maintains the trial court erred in refusing to consider limitation 21, the preexisting condition

clause in its policy. At trial, the court refused to allow Theodore Liapis to testify regarding limitation 21. The court also refused to allow Central Reserve to amend its pleadings to present the issue of preexisting condition as a defense.

Central Reserve claims the court should not have ignored the preexisting condition clause because it was raised by the evidence as an issue. The court concluded that it was physical injury to Bryan's brain that necessitated treatment. Central Reserve argues the court should have considered the effect of limitation 21 on the Malerbis' benefits because the evidence also showed the injury was incurred prior to the effective date of the policy.

The trial court refused to allow Liapis' testimony because neither Central Reserve's answer nor the pretrial stipulation made as a result of the pretrial conference provided that preexisting condition would be an issue at trial.

Paragraph 6 of its answer provides that Central Reserve "[a]ffirmatively alleges that Plaintiff Larry Malerbi has been paid all claims due and owing on his claim under the terms of the insured's policy Number 28-K-408-001."

The pretrial stipulation, an agreement between the parties themselves, provided that two issues remained to be resolved by the court:

1. Whether the charges incurred for Bryan Buckley's admission to Nebraska Psychiatric Institute, and attending physician bills are covered by the defendant's certificate of insurance, or fall within the limitation for treatment of a mental condition.

2. Coordination of Benefits as a result of the existence of an insurance policy issued by Union Casualty Company.

Pretrial conferences are conducted to simplify the issues, amend pleadings, and avoid unnecessary proof of facts at trial. *Bump v. Firemens Ins. Co.*, 221 Neb. 678, 380 N.W.2d 268 (1986). They are also conducted to avoid traps and surprises at trial. *Priest v. McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985).

Central Reserve's answer, specifically paragraph 6, may originally have been broad enough to encompass a defense

based on limitation 21 of the policy. However, our cases hold that "[i]ssues specified at a pretrial conference control the course of an action and, unless altered by the court, constitute the issues on which the case is tried." *Bump v. Firemens Ins. Co., supra* at 684, 380 N.W.2d at 273. The issues set out in a pretrial order supplant the issues raised in the pleadings. *Bump, supra.* Further, failure to object to the specification of issues in a pretrial order waives error claimed in that regard on appeal. *Bump, supra; Little v. Gillette, ante* p. 70, 402 N.W.2d 852 (1987). The pretrial stipulation in this case was the equivalent of a pretrial order. Because Central Reserve stipulated to the issues to be tried, it cannot now complain that other issues should have been included.

Also, admission of the entire policy into evidence was not sufficient to raise a question as to the preexisting condition clause. Provisions in an insurance policy which limit the benefits payable thereunder "are generally defensive in character and must be pleaded and proved by the insurer." *Miller v. Industrial Hospital Assn.,* 183 Neb. 704, 705, 163 N.W.2d 891, 893 (1969).

Under Neb. Rev. Stat. § 25-852 (Reissue 1985), the trial court may, before or after judgment, permit amendment of a pleading in the furtherance of justice. A pleading should not be amended to conform to the proof where the proposed amendment substantially changes the nature of the claim or defense. *West Town Homeowners Assn. v. Schneider,* 215 Neb. 905, 341 N.W.2d 588 (1983). The decision to allow or deny such an amendment rests in the sound discretion of the trial court. *West Town Homeowners Assn., supra.*

Several reasons justified the trial court's rulings denying both the admission of Liapis' testimony and the motion to amend the pleadings.

The record suggests that the preexisting condition clause was not contemplated as a defense until 1½ days into a 2-day trial, after the Malerbis had rested their case, and after their expert witness had left the state. Central Reserve had several opportunities prior to this time to raise the issue but failed to do so specifically in its pleadings, in the pretrial conference, in the pretrial stipulations, and in its answers to interrogatories. In its

answers to interrogatories, Central Reserve stated that limitation 19 provided the basis of its claim of full payment. It did not indicate reliance on the defense of preexisting condition. Further, the testimony by Theodore Liapis was that the payments made to the Malerbis were made in accordance with limitation 19.

Under these circumstances the trial court correctly refused to consider limitation 21, as the pretrial stipulation did not specify an issue to which it was relevant. Further, the court committed no abuse of discretion in excluding Theodore Liapis' testimony as to limitation 21 nor in refusing Central Reserve's motion to amend its answer. The testimony of Liapis was irrelevant to the issues designated in the pretrial stipulation to which Central Reserve did not except. Permitting Central Reserve to amend its answer at such a late stage in the trial would not have served the ends of justice. Instead, the result would have been to allow Central Reserve to make a substantial change in its defense and to provide a trap into which the Malerbis might unwittingly fall.

In its next argument, Central Reserve claims the trial court erred by refusing to determine the coordination of benefits issue.

The Central Reserve coordination of benefits provision provides in relevant part:

> If you or one of your Dependents is eligible to receive benefits under another plan which provides medical or dental benefits, the benefits provided under this plan will be coordinated with the benefits from all of your other plans so that up to 100% of the "allowable expenses" incurred during a calendar year will be paid jointly by all plans.
>
> A plan is considered to be any Group insurance coverage or other arrangements of coverage for individuals in a group which provides medical or dental benefits or services on an insured or an uninsured basis, individual Blue Cross/Blue Shield contracts, service group plans or prepayment coverage, any coverage under government programs and any coverage required or provided by any statute including any national or state no-fault motor vehicle insurance act.

. . . .

When benefits of another plan or plans are involved, a determination must be made to identify one plan as the primary plan and the remaining plan as the secondary plan. The primary plan will pay regular benefits as if no other plan existed. The secondary plan would pay the excess allowable expenses, but not to exceed more than the plans [sic] regular benefits.

The rules establishing the order of benefit determination are:

(a.) The plan which does not have the coordination provision is considered the primary plan.

The evidence shows Bryan was covered by a group health insurance policy issued by Union Casualty Company on August 19, 1981. That policy, which was in evidence, does not contain a coordination of benefits clause. The NPI billing which is in evidence shows that Union paid $7,500 of Bryan's hospitalization expenses on July 14, 1983. The Union policy contains a provision limiting the maximum amount payable for covered expenses incurred for mental, nervous, or emotional disease or disorder to $7,500 for any one insured person during that person's lifetime.

The evidence shows that at the time of trial, a suit for benefits by the Malerbis was pending against Union because Union had denied coverage under its policy. Union was not a party to this action. The trial court concluded that it should not decide the coordination of benefits issue, as there was no final determination as to Union's obligation. The trial court entered judgment against Central Reserve for $43,318.13.

Central Reserve maintains that by refusing to consider the issue of coordination of benefits the court awarded the Malerbis $7,500 more than they were entitled to at the time of the judgment order.

The problem with this argument is that at the time of trial, Union's obligation to the Malerbis was unclear. Central Reserve's claims director, Theodore Liapis, acknowledged this fact at trial and admitted that there could be no coordination of benefits absent another group plan under which benefits were either paid or payable.

The record does not show what issues were involved in the litigation between the Malerbis and Union. The only evidence concerning the litigation is that Union was denying coverage. The trial court did not have the necessary parties or evidence before it to determine whether Bryan was eligible to receive benefits under the Union plan. As the record stands, the trial court could not determine the coordination of benefits issue.

With coordination of benefits a nonissue, the trial court's judgment was correct. In *Hollister v. Government Emp. Ins. Co.*, 192 Neb. 687, 224 N.W.2d 164 (1974), we held that the availability of a collateral means of discharging liability actually incurred within the meaning of an insurance policy does not bar recovery for those expenses under the policy. Applied to this case, the fact that the Malerbis received $7,500 from Union did not preclude recovery against Central Reserve for covered expenses under its policy.

Finally, Central Reserve summarily asserts for the first time in the last paragraph of its reply brief that the attorney fee awarded below was unreasonable and excessive. In *Smith v. Union Ins. Co.*, 218 Neb. 797, 359 N.W.2d 113 (1984), we held that the amount of attorney fees allowed pursuant to Neb. Rev. Stat. § 44-359 (Reissue 1984) rests generally in the sound discretion of the trial court. Factors to be considered in determining the value of the services rendered include

> "the amount involved, the nature of the litigation, the time and labor required, the novelty and difficulty of the questions raised and the skill required to properly conduct the case, the responsibility assumed, the care and diligence exhibited, the result of the suit, the character and standing of the attorney, and the customary charges of the bar for similar services. . . ."

*Smith v. Union Ins. Co., supra* at 798, 359 N.W.2d at 114.

In view of these considerations, the record does not reflect an abuse of discretion by the trial court in the allowance of the attorney fee. The judgment is affirmed.

The Malerbis are awarded an additional attorney fee of $2,500, pursuant to § 44-359, for the services of their attorney in this court.

AFFIRMED.