Jerry Eugene **JOHNSON,** Plaintiff,

v.

**GENERAL AMERICAN LIFE INSURANCE COMPANY; National Service Industries, Inc.,** Defendants.

No. CIV.A. 701CV00042.

United States District Court,
W.D. Virginia.
Roanoke Division.

Dec. 21, 2001.

---

---

Paul Graham Beers, Glenn, Flippin, Feldman and Darby, Roanoke, VA, for Jerry Eugene Johnson.

Kevin S. Blair, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for General American Life Ins. Co., National Service Industries, Inc.

### MEMORANDUM OPINION

KISER, Senior District Judge.

This is a declaratory judgment action brought by plaintiff. Jerry E. Johnson ("Johnson") under 28 U.S.C. §§ 2201–2202 and 29 U.S.C. § 1132 of the Employee Retirement Income Security Act ("ERISA") with regard to a long term disability benefit policy issued to him by the defendants. Johnson claims that his benefits were improperly terminated under a mental illness limitation contained therein.

The Court has jurisdiction under 28 U.S.C. § 1331 and the above statutes. A bench trial was conducted on September 10 and 11, 2001, and the parties have submitted post-trial briefs, making this matter ripe for disposition.

The issue for the Court to decide, best considered in narrow terms due to the wealth of case law on the subject, is whether, using a *de novo* standard of review, the Policy's Mental Illness Limitation limits benefits where a policyholder's disabling depression was caused by a physical ailment which qualified as a physical disability for a limited time. For reasons stated below, I **DENY** plaintiff's plea for a decla- ration that his disability is covered under the long term disability policy issued to him by the defendants, and all other relief requested in his Complaint.

### I. Findings of Fact

The relevant facts are largely undisputed. To the extent that they are not, the following narrative represents my findings of fact.

Plaintiff Johnson worked at National Linen, a division of National Service Industries, Inc. (collectively, "National") for twenty two years before he was stricken with a heart attack in June, 1996. In September, 1996, he had triple bypass heart surgery during a lengthy hospital stay.

Johnson attempted return to work in January of 1997, but was not able to continue because of an inability to concentrate and lack of physical and emotional stamina. Plaintiff's Trial Exhibit 2 (Deposition of L. Douglas Balke, M.D. ("Balke Dep."), Dep. Ex. 5 (letter from Johnson's internist, Dr. Charles H. Hiles, dated June 23, 2000)). Johnson's inability to work is the result of the major depression which Johnson developed following his hospitalizations, and for which he has been treated unsuccessfully by Dr. Balke and others since March, 1997. *Id.*

Throughout the relevant period, Johnson was insured under a long term disability policy issued by General American Life Insurance Company ("General"). Pl.Ex. 16 (Policy No. LTD–800, Bates Nos. GA–0166–0195).

Relevant portions of the Policy are as follows:

### Section I Definitions

. . .

*"Sickness" means illness or disease.* It will include pregnancy. The disability must begin while the employee is insured under the policy.

"Disability" and "disabled" mean that *because of injury or sickness:*

 1. The insured cannot perform each of the material duties of his regular occupation; and

 2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful employment for which he is reasonably fitted by training, education or experience.

## Section III Benefits

### DISABILITY

When the Company receives proof that an insured is disabled *due to sickness or injury* and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit.... The benefit will be paid for the period of the disability.

. . .

### MENTAL ILLNESS LIMITATION

. . .

 Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments....

 "Mental illness" means mental, nervous or emotional diseases or disorders *of any type.*

Pl.Ex. 16 (Policy, Bates No. GA–0172–0173, 0176, 0185) (emphasis added).

Defendant General American Life Insurance Company ("General") approved Johnson for long term disability benefits on June 18, 1997. Defendant's Trial Exhibit 8 (General's determination letter, Bates No. GA–0003, 0004). Johnson received benefits for 24 months before General terminated his benefits under the "Mental Illness Limitation" contained in the Policy. Def. Ex. 2 (letter of March 29, 1999, advising Johnson that benefits would terminate

on April 25, 1999). Johnson appealed. In its letter dated September 15, 1999, General again denied benefits based upon the opinion of Dr. Hiles that Johnson was "released from a cardiovascular perspective for return to work on a permanent basis eight hours a day." Def. Ex. 5. According to Hiles, "On a purely physical basis, [Johnson] has had a full-time work capacity from January 6, 1997, when he returned to work, until present." *Id.* Hiles still considered Johnson to be disabled, but General understood Hiles to state that Johnson's "disabling diagnosis" at that point was "that of Depression and not cardiovascular disease." *Id.* Therefore, it upheld its earlier decision to enforce the Mental Illness Limitation. General issued a final denial on January 17, 2001. Def. Ex. 6.

Johnson was not depressed prior to the onset of coronary disease in June, 1996. Balke Dep. Ex. 5. The opinions of Dr. Hiles-and to a lesser degree of certainty, Dr. Balke—consistently have been that Johnson's depression was caused by, or exacerbated to the point of disability by, his cardiovascular condition. Balke Dep. 9:6–16; 28:17–24; 30:1–2; 31:17–19; Dep. Ex. 2, 3 and 5; Pl.Ex. 6 (Hiles' patient progress notes dated October 31, 1996); Pl.Ex. 11 (Hiles letter to the Social Security Administration dated April 1, 1997); Pl. Ex. 18 (Hiles letter dated May 19, 1999); Def. Ex. 8 (Hiles letter dated June 23, 2000, Bates No. GA–0145–0146; Balke letter dated July 21, 2000, Bates No. GA–0147). Johnson still has coronary artery disease. Pl.Ex. 18. However, aside from the depression caused by that ailment, Johnson would be able to return to work. Def. Ex. 5. (General denial letter quoting Dr. Hiles, dated September 15, 1999).

At trial, General presented no expert testimony to the contrary. It did, however, attempt to undermine the scenario de-

scribed by Johnson's doctors. Although General's argument relied, for the most part, on excluded deposition testimony,[1] it also argued that Johnson's psychiatrist, Dr. Balke, equivocated once or twice on the cause of Johnson's depression, saying that it was a reaction to Johnson's reduced responsibilities after he returned to work. Def. Bf. at 5–6 (*citing* (Balke Dep., 14–15, 20); Def. Ex. 7 (Balke letter of July 21, 2001, Bates. No. GA–0147)). Balke consistently claimed that Johnson's heart disease was "a significant factor" in causing his depression, but he would not go so far as bill his treatments under a code that unequivocally described the cause as physical. Balke Dep. at 25–26. General pointed out that the DSM–IV recognizes a separate diagnosis for mental disorders caused by physical conditions and that Balke did not make this diagnosis of Johnson. Balke Dep. at 22. Balke testified that Johnson's heart condition "precipitated" his depression, but he could not testify that Johnson *would not* have had depression if he also had not developed heart disease, due to the possibility of genetic susceptibility and other stressors. Balke Dep. at 16–17. Balke also noted that during one period following the surgery, Johnson was walking up to three miles a day, did yard work, and completed staining a large deck. Balke Dep. at 21–22.

Johnson points out, however, that Dr. Balke has repeatedly deferred to Dr. Hiles concerning the etiology of Johnson's depression, claiming that Hiles is best qualified to opine on that matter. Pl. Bf. at 5–7 (*citing* Balke Dep. 9:6–16, 27:1–2, 28:17–24, 31:17–19; Balke Dep. Ex. 2 (Balke letter of June 16, 1999)). General does not dispute Dr. Hiles' opinion, but in fact relied upon it as the basis for limiting Johnson's benefits. For these reasons, I adopt Dr. Hiles' opinion that until January 6, 1997, Johnson was unable to perform all regular duties of his job due to his heart condition; that after this date and to the present, Johnson has still been unable to perform all these duties; that the reason Johnson has not been able to perform all of the duties of his job since January 6, 1997 is due to depression and not due to the physical symptoms of his heart disease; and that Johnson's depression was caused, or at least exacerbated to the point of disability, by Johnson's heart condition.

## II. Conclusions of Law

1. *The applicable law of ERISA plan construction is that of federal common law as developed by the Fourth Circuit. However, the particular choice of law is not dispositive to this matter.*

■ In federal district courts, the choice-of-law analysis to be applied to a given case is that of the state in which the forum court resides. *Klaxon Co. v. Stentor Elec. Manufact. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Virginia conflict-of-law doctrine will enforce contractual forum selection clauses "unless the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power." *Paul Business Systems, Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 342, 397 S.E.2d 804, 807 (1990) (*citing The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); Restatement (Second) of Conflict of Laws (1988 Revisions) § 80 (Supp.1989)). In this case, the Policy states that it is "delivered in Georgia and subject to the laws of that jurisdiction." Pl.Ex. 16 (Bates No. GA–0166). General,

---

1. At trial, the parties failed to move into evidence the transcript of Johnson's own deposition. The defendants later moved to reopen the record over Johnson's objection. By Order dated November, 30, 2001, I denied General's motion.

which opposes the application of Georgia state law, does not argue that this provision is unfair, unreasonable, or affected by fraud or unequal bargaining power. If state law is to be applied, it will be Georgia law.

■ The parties raise a question concerning whether ERISA rules of construction preempt Georgia law on matters of ERISA plan interpretation. On this issue of federal law, this Court must look to judicial decisions binding upon it, i.e., Fourth Circuit holdings. The Fourth Circuit has held that when interpreting insurance policies under ERISA, courts are to be guided by federal common law rules. *Balthis v. AIG Life Ins. Co.,* 102 F.Supp.2d 668, 670 n. 3 (W.D.Va.2000), *aff'd,* 246 F.3d 662, 2001 WL 262658 (4th Cir.2001) (table). Federal courts may adopt and apply state law, however, if compatible with national policies under ERISA, and they "often apply general principles of contract law, insurance law, or trust law that do not conflict" with ERISA. *Jenkins v. Montgomery Industries, Inc.,* 77 F.3d 740, 744 (4th Cir.1996). The test, said the court in *Jenkins,* is whether a particular construction uses "state law to allow a cause of action otherwise precluded by ERISA," or else "applies a state law concept that modifies an ERISA plan by overriding its explicit terms." *Id. (quoting Pilot Life Ins. v. Dedeaux,* 481 U.S. 41, 57, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) and *Phoenix Mutual Life Ins. Co. v. Adams,* 30 F.3d 554, 563 (4th Cir.1994)). In *Jenkins,* the Fourth Circuit held that a South Carolina rule of construction requiring a carrier to show causation between an activity excluded by a policy and the injury claimed by the insured did not conflict with ERISA, finding ERISA silent on the matter. The district court's use of the rule was simply a good example of fashioning gap-filling federal common law from applicable state doctrines. 77 F.3d at 744.

■ The plaintiff desires the application of Georgia law for three reasons: (1) Georgia law will apply the doctrine of *contra proferentem* to ambiguous policy terms, construing such terms in favor of the insured; (2) in Georgia, insurers bear the burden of proving that a factual situation falls within an exclusionary clause; and (3) when policy construction is required, exclusions are strictly construed against the insurer and in favor of the insured. Pl. Bf. at 13 (*citing York Ins. v. Williams Seafood of Albany,* 273 Ga. 710, 544 S.E.2d 156, 156 (2001); *Connell v. Guarantee Trust Life Ins. Co.,* 246 Ga. App. 467, 541 S.E.2d 403, 406 (2000) (further citations omitted)). The Fourth Circuit holdings cited by the parties suggest that the same rules of construction should be applied under federal common law. In *Wheeler v. Dynamic Engineering, Inc.,* 62 F.3d 634, 638 (4th Cir.1995), the court held that "[w]e interpret an ERISA health insurance plan under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense.... Where a term is ambiguous, we must construe it against the drafter, and in accordance with the reasonable expectations of the insured." 62 F.3d at 638 (citations omitted). In *Balthis,* the court recognized that "any ambiguities will be construed against the drafter" without qualification. 102 F.Supp.2d at 670 (citations omitted). In *Glocker v. W.R. Grace Co.,* 974 F.2d 540, 544 (4th Cir., 1992), the court stated that if ambiguities remained after attempts to use ordinary meanings and extrinsic evidence, "the Plan should be construed against the drafter.". In *Jenkins,* the court enforced a "basic" South Carolina rule, identical to that in Georgia, that insurers carry the burden of proving that loss falls within an exclusionary clause-even when the carrier

is the declaratory judgment defendant. 77 F.3d at 743–744 (citations omitted). The court in *Jenkins* also suggested that "general principles of contract law [and] insurance law" included the application of *contra proferentem* as a federal common law rule. 77 F.3d at 744, n. 5 (*citing Masella v. Blue Cross and Blue Shield of Connecticut*, 936 F.2d 98, 107 (2nd Cir.1991)). Thus, while I hold that—as a matter of legal formality-federal common law rules of construction preempt Georgia law in this matter, the federal rules are not significantly different than those of Georgia. Under both the Fourth Circuit holdings advanced by General and the Georgia rules advanced by Johnson, General has the burden under *de novo* review of proving that Johnson's case falls within the Mental Illness Limitation. If that exclusion has a plain and unambiguous meaning, I should enforce that meaning; if not, I should construe the limitation in favor the insured-or at least, the insured's reasonable expectations of coverage. Under the separate but related doctrine of strict construction, if the terms of the exclusion are insufficiently clear and distinct to limit Johnson's benefits, I should read them in favor of coverage.[2]

### 2. The Court will apply a de novo standard of review.

 A district court should review a plan administrator's denial of ERISA plan benefits *de novo*, unless the benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan." *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1021 (4th Cir. 1993) (*quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The parties agreed at trial that the Court should use a *de novo* standard. Def. Bf. at 2. This becomes important in reviewing the case law, as an interpretation of Policy terms that may be acceptable when a trustee has discretion to decide them "may not be appropriate when the claim must be reviewed *de novo*." *Glocker*, 974 F.2d at 543.

### 3. The terms of the Policy's Mental Illness Limitation are not ambiguous.

 In the Fourth Circuit, as in the majority of federal circuits, "[w]e interpret an ERISA health insurance plan under ordinary principles of contract law,

**2.** The same rules of construction would apply if I allowed the Policy terms to determine the choice-of-law, then allowed the Eleventh Circuit's holdings on ERISA preemption and federal common law to govern. Like the holdings of Georgia state courts, Eleventh Circuit ERISA holdings are "the laws of that jurisdiction." In *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1148 (11th Cir.2001), the court held, like those just discussed, that no language in ERISA or federal common law conflicted with Georgia insurance doctrine. It also held that the forum-selection clause before it did not really involve an issue of preemption, but of enforcing the terms to which the parties had contracted. "[W]hen private contracting parties formulate a choice-of-law provision that, with a view to defining liability, incorporate state legal doctrines, those

doctrines are not emanations of state authority, they are simply a convenient shorthand for what the private contracting parties wish to agree to." Only if the principles of liability agreed upon were inconsistent with ERISA would constructions particular to ERISA preempt the state rules. 247 F.3d at 1148–1149 (*citing Wang Laboratories, Inc. v. Kagan*, 990 F.2d 1126, 1128–1129.(9th Cir.1993)). The Eleventh Circuit, interpreting ERISA policies issued in Georgia, has consistently held that federal common law includes the doctrine of *contra proferentem*. See *HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 994 n. 24 (11th Cir.2001) (citations omitted). The rules of policy interpretation asserted by Johnson thus appear to be universal.

enforcing the plan's plain language in its ordinary sense.... Where a term is ambiguous, we must construe it against the drafter, and in accordance with the reasonable expectations of the insured." *Wheeler*, 62 F.3d at 638. "Ambiguity only exists if one of the reasonable interpretations of a policy term results in coverage while the other results in exclusion." *In re Campbell*, 116 F.Supp.2d 937, 949 (M.D.Tenn.2000) (*quoting Luton v. Prudential Ins. Co. of Amer.*, 88 F.Supp.2d 1364, 1370 (S.D.Fla.2000)). Contract language is also ambiguous "if the terms are inconsistent on their face." *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 586 (1st Cir.1993). "Alleged ambiguities should be reconciled, if possible, by giving language its ordinary meaning." *Glocker*, 974 F.2d at 544.

■ Coverage is triggered under the Policy when an insured becomes "disabled due to sickness or injury" (hereafter, the "coverage clause"), but is limited to 24 months when the insured is disabled "due to mental illness" (hereafter, the "Limitation"). Johnson argues that these two clauses, together, create an ambiguity in the meaning of "due to" when applied to his case. Plaintiff's Reply Brief ("Reply") at 7–9 (*citing Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir.1999) ("due to" has been given interpretations "ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other") (*quoting Adams v. Director, OWCP*, 886 F.2d 818, 821 (6th Cir.1989))). Because General has not defined what end of the spectrum "due to" means, argues Johnson, the phrase is ambiguous as applied to his condition. I find no necessary ambiguity, however. The coverage clause defines a universal set of conditions which are covered; the Limitation simply limits benefits to a subset of these covered conditions. Whether "due to" is defined as "sole and proximate cause" or "a contributing cause" or some other meaning, the relationship between the two clauses remains as one in which the Limitation carves out a subset of covered conditions for termination after 24 months.

"Sickness" is defined by the Policy to mean "illness or disease." "Disability" means "that because of injury or sickness... the insured cannot perform each of the material duties of his regular occupation." "[I]llness or disease" is not defined, but presumably includes mental illnesses as well. Indeed, the fact that disabilities "due to mental illness" are only *limited* to 24 months, and not excluded altogether, shows that disability due to a mental illness is initially a covered condition. The coverage clause thus creates a universal set of all kinds of disabilities "due to sickness or injury," including mental illnesses:

> When the Company receives proof that an insured is disabled *due to sickness or injury* and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit.... The benefit will be paid for the period of the disability.

Pl.Ex. 16 (Bates No. GA–0176) (emphasis added.) The Limitation as written reads in turn:

> Benefits for disability *due to mental illness* will not exceed 24 months of monthly benefit payments....

Pl.Ex. 16 (Bates No. GA–0185) (emphasis added.) Inserting the full definition of the covered "disability" into the clause which limits benefits if the disability is due to a mental illness, one sees that the clauses can be read in conjunction with no ambiguity or contradiction:

> Benefits for disability *due to sickness or injury due to mental illness* will not exceed 24 months of monthly benefit payments....

In other words, disabilities due to sickness or injury are covered for the period of disability, except that benefits for disabilities due to certain kinds of sickness or injury-i.e., mental illnesses-are limited to 24 months.

Johnson points out that the term "disability" is already defined to mean inability to perform work duties "because of injury or sickness." Thus, argues Johnson, the coverage clause contains two iterations of the same qualifying clause. He argues that in order for the coverage clause not to contain surplusage or redundancy, the phrase "due to sickness or injury" in the coverage clause must mean "exclusively caused by sickness or injury." Similarly, he argues, the phrase "due to mental illness" in the Limitation must mean "exclusively caused by mental illness." Reply at 10. I do not find this reading to decide the ultimate issue. In order for disability due to mental illness to be, initially, a covered condition under Johnson's reading, mental illness must still be included in the meaning of "sickness or injury." The Limitation would then limit benefits for disability due to sickness or injury *caused exclusively* by mental illness. What brings the parties to this litigation, however, is the fact that there is a sense in which Johnson's inability to work since 1997 is "caused exclusively by" his depression. It all depends upon how far back in the chain of causes for Johnson's disability one goes. The Limitation is, as Johnson himself points out, simply silent as what to do when there is a sequence of causes resulting in a disability due to mental illness. This does not compel me to adopt an interpretation that is ambiguous, however. Rather, a plain reading of the Limitation shows that it does not matter whether "due to" means "exclusively caused by" or "caused in part by." No matter what the meaning of "due to," the Limitation makes consistent sense only if one reads it as carving out a subset of covered disabilities for limitation.

A second problem with Johnson's reading is that if "due to" means "caused exclusively by," then the phrase "because of injury or sickness" in the definition of "disability" must mean "due *in any part to* injury or sickness." I do not see how this comports with the ordinary meanings and usages of those phrases. If the court in *Kimber* is correct concerning the range of meanings of "due to," then the same range of meanings applies to "because of." Furthermore, I find it hard to believe that the parties intended that the phrase "because of" means "caused in any part by"-a meaning which would allow a person who was 90% unable to work because of other personal commitments and 10% because of sickness to qualify as "disabled." Rather, both "due to" and "because of" have some ambiguity in their meanings, but this does not make the Limitation itself ambiguous in Johnson's case.

I recognize that this holding is odds with that affirmed by New York appellate courts in *Prince v. United States Life Ins. Co.*, 42 Misc.2d 410, 248 N.Y.S.2d 336, 337–338 (N.Y.Sup.Ct.1964), *aff'd*, 23 A.D.2d 723, 257 N.Y.S.2d 891 (N.Y.App.Div.1965), *aff'd*, 17 N.Y.2d 742, 270 N.Y.S.2d 209, 217 N.E.2d 33 (1966). In *Prince*, a boy developed "a psychoneurosis which was a reaction to the physical injury the boy sustained," in that case, the loss of an eye. The boy's medical expense policy excluded coverage for loss caused by "mental disease or deficiencies, psychotic or psychoneurotic disorders or re-actions." *Id*. The court held that "[a] layman would read the exception as applying to mental disorders unconnected with bodily injury." *Id*. I find the decision distinguishable because the triggering physical ailment-the loss of an eye and the permanent disruption of the boy's life caused by it-did not abate

over time as has Johnson's heart condition in this case. I also find the court's holding in *Prince* conclusory, if not simply wrong. In this case, I do not think the average layman would have any difficulty reading the phrase "disability due to mental illness" to be a limiting clause where the insured's doctors had concluded that the insured was not disabled "from a physical point of view."

I also recognize that this interpretation of the Limitation does not say what to do when an insured is unable to work, in part, due to physical illness, and unable to work, in part, due to a mental condition. That is a question for another day and circumstance. The question of how to apply a policy when there are mixed causes has not been insurmountable for courts interpreting worker compensation, other insurance, and tort cases. If the term "mental illness" has an unambiguous meaning in this case, then Johnson's mental illness is the only thing that is preventing him from working.

4. *The term "mental illness" in the Policy is not ambiguous as applied to Johnson's depression, even if that depression had an identifiable physical cause.*

According to the Policy, " 'Mental illness' means mental, nervous or emotional diseases or disorders *of any type*." The ordinary meaning of this language would suffice to include Johnson's depression. It is not necessary to import any particular meaning to the qualifier "of any type," however. According to plain language in its ordinary sense, depression is a "mental illness." The fact that Johnson's depression was caused by, was triggered by, or developed in response to, a coronary disease does not change the ordinary meaning of the term.

Johnson relies upon numerous authorities which have held that the etiology of a mental or behavioral condition must be considered in determining whether the condition is unambiguously a "mental illness." Numerous courts have ruled that where a plaintiffs' covered physical conditions are shown to have caused disabling mental illnesses, mental illness limitations do not apply. *Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 310–311 (7th Cir.1992) ("mental illness" is ambiguous where applied to disorders caused by organic illnesses); *Lang v. Long–Term Disability Plan*, 125 F.3d 794, 799 (9th Cir. 1997) (*contra proferentem* favors interpretation that mental illness with identifiable organic cause is not excluded) (*citing Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir.1990), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990)); *Akins v. Washington Metro. Area Transit Authority*, 729 F.Supp. 903, 906 (D.D.C.1990) (limitation is ambiguous; "appear[s] to cover mental disabilities caused by physical injury," including depression following heart surgery); *Dorsk v. UNUM Life Ins. Co. of Amer.*, 8 F.Supp.2d 19, 21–23 (D.Me.1998) (*contra proferentem* favors interpretation that mental illness with identifiable organic cause is not excluded, where policy is silent as to causes); *Luton v. Prudential Ins. Co. of America*, 88 F.Supp.2d at 1373 (in view of conflicting case law and evidence, and possibility that Eleventh Circuit would not exclude mental illnesses with organic causes, both parties have provided reasonable interpretations, therefore exclusion is ambiguous); *Elam v. First Unum Life Ins. Co.*, 72 Ark.App. 54, 32 S.W.3d 486, 490 (2000) (ambiguous because legal authorities, medical authorities, and public cannot agree on definition); *Malerbi v. Central Reserve Life*, 225 Neb. 543, 407 N.W.2d 157, 163 (1987) (where all experts agreed there was a possible organic

basis for insured's emotional or behavioral problems, i.e., a structural deficit in the temporal lobe region of his brain, the insured could reasonably have understood that treatment for his problems would not be for a mental condition); *Prince,* 248 N.Y.S.2d at 338 (plain meanings dictate that mental disorders caused by bodily injuries are not excluded); *Heaton v. State Health Benefits Com'n.,* 264 N.J.Super. 141, 624 A.2d 69, 72 (where language of limitation is silent on cause, "mental illness" is ambiguous as applied to Alzheimer's disease). Johnson argues that the Fourth Circuit, while not ruling directly on the issue, apparently approved the reasoning of two of these holdings in *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 88 (4th Cir.1993) (*citing Kunin,* 910 F.2d at 539; *Phillips,* 978 F.2d at 314).

General, in turn, responds with authorities which have held that the etiology of mental illness is not relevant to the meaning of the term. Def. Bf. at 9–14 (*citing Brewer v. Lincoln Nat. Life. Ins. Co.,* 921 F.2d 150, 154 (8th Cir.1990) ( "illnesses whose primary symptoms are depression, mood swings, and unusual behavior are common characterized as mental illnesses regardless of their cause"), *cert. denied* 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991)); *Saah v. Contel Corp.,* 978 F.2d 1256 (unpublished), *opinion at* 1992 WL 310225 (4th Cir.1992) (rejecting plaintiff's argument that since a brain injury caused by a car accident was an organic cause of her psychiatric illnesses, those illnesses were medical, and not psychiatric, in nature); *Tolson v. Avondale Indust., Inc.,* 141 F.3d 604, 606–607, 610 (5th Cir. 1998) (ERISA requirement that Summary Plan Descriptions are to be couched in ordinary, conversational language explains lack of plan definition of "mental disorder"; and since laypersons, other Circuits, and the American Psychiatric Association

characterize depression as a "mental disorder," it would be inappropriate to interpret the term only to include illnesses which have no physical manifestations) (*citing Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979 (5th Cir.1996) (depression is a mental disorder, irrespective of its physical causes or symptoms); *Blake v. Unionmutual Stock Life Ins. Co.,* 906 F.2d 1525, 1527–1530 (11th Cir.1990) (hospitalization for depression after giving birth, where no "organic causation for this illness" had been shown, was treatment for a mental illness); *In re Campbell,* 116 F.Supp.2d 937, 948 (M.D.Tenn.2000) (surveying Circuit split, concluding that where definition of "mental illness" included "mental or emotional disorders of any kind," term was not ambiguous)).

Most of the above authorities are distinguishable. *Phillips* is distinguishable on its facts because the plaintiff in that case suffered from "[c]ongenital encephalopathy... a brain malfunction, manifested by neurological defects." 978 F.2d at 304. According to the insured's doctors, the condition meant "that you basically have some diffuse brain dysfunction that's affecting pretty much all aspects of behavior." *Id.* Though the court in *Phillips* justified its holding with principles favorable to Johnson in this case, it was much easier to find ambiguity where the observable symptoms were immediately traceable to a physical brain condition. The court in *Kunin* had to decide whether the term applied to autism, a condition considerably more difficult to call "mental illness" using ordinary usage. 910 F.2d at 541. *Lang,* in turn, simply followed *Kunin* without further analysis. In *Akins,* the insured developed post-traumatic stress disorder following a robbery in which he was stabbed in the heart. His symptoms included "fatigue, inability to concentrate, shortness of breath, and chest pains." 729

F.Supp. at .904. *Akins* is on point, though again, the observable symptoms which the insured displayed in that case were not all ones that would normally described as "mental" in ordinary discourse, and so the case is somewhat more ambiguous than ours. The *Akins* court also relied upon the analysis in *Prince* for its holding. 729 F.Supp. at 906. The court in *Malerbi,* like that in *Phillips,* also dealt with a brain injury, which is considerably more difficult to describe as "mental illness." The court in *Heaton* dealt with the application of the term to Alzheimer's, another condition for which the term "mental illness" is problematic. Contrary to Johnson's suggestion, the Fourth Circuit in *Doe* did not adopt *Phillips* and *Kunin* on any issue similar to those in this case, but merely cited those opinions for the propositions that *contra proferentem* and strict construction of exclusions were appropriate in ERISA reviews. 3 F.3d at 89. The court in *Brewer,* like other Eighth Circuit courts, refused to apply *contra proferentem* to an ERISA plan, and so did not even consider ambiguity as an option in interpreting the term. 921 F.2d at 153. The Court in *Blake* clearly appeared to leave open the possibility that "mental illness" may be ambiguous with respect to a traditional mental illness with an identified organic cause, and so its opinion is not helpful. In *Campbell,* the insured's depression was caused by an identified chemical imbalance; however the plan's definition of "mental illness" expressly included "those [disorders] caused by chemical imbalance." 116 F.Supp.2d at 948. Unlike General's Policy here, the plan in *Campbell* defined the term "mental disorder," in part, by the same cause which led to the insured's disorder. Other cases cited by General, including *Saah,* an unpublished Fourth Circuit opinion, are distinguishable in that they were decided using an abuse of discretion standard. Except for *Doe,* which is not on point, none of these opinions are binding upon this Court.

With the remaining cases, particularly those such as *Dorsk,* 8 F.Supp.2d at 22, and *Luton,* 88 F.Supp.2d at 1373, which draw a distinction between mental illnesses for which organic causes are identified and those which are not, I simply disagree. Of the arguments adopted in the cases cited by the parties, I find more persuasive the plain-language analysis of the court in *Brewer,* which noted that:

> Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.
>
> Neither policy in this case limited the definition of "mental illness" to only those illnesses that have a non-organic origin, and the district court should not have adopted a definition that effectively imposed such a limitation. By focusing upon the disease's etiology, the district court considered factors that are important to experts but not to laypersons. The court thus failed to examine the term "mental illness" as a layperson would have, which is the examination we conclude ERISA and federal common law require.

921 F.2d at 154. This reasoning was adopted by the Fifth Circuit in *Lynd* and *Tolson* when it held that depression was unambiguously a "mental illness." 94 F.3d at 983, 141 F.3d at 609–610. This is not to say that I agree that a layperson's evaluation of *symptoms* should be the overriding standard. "[O]veremphasis on what a layperson would characterize as a mental ill-

ness ignores the fact that laymen do not generally rely upon medical expertise to diagnose their disorders. Such an approach would render diseases such as Alzheimer's disease or brain cancer 'mental illnesses' because of their symptoms." *Luton,* 88 F.Supp.2d at 1372 (*citing Dorsk,* 8 F.Supp.2d at 21–22). However, I do think there is a sufficient lay and medical consensus concerning what kinds of *diagnoses* concern "mental illnesses." Notwithstanding *Dorsk* and *Luton,* laypersons *do* rely upon medical expertise in diagnosing their conditions. Once that diagnosis is made, however, ordinary usage is sufficient to categorize some diagnoses-such as depression—as "mental illnesses," and other diagnoses—such as organic brain damage and Alzheimer's—as something other than mental illnesses. *See, e.g.* Balke Dep. at 9 (stating that Johnson's major depression, "without a doubt," was a mental illness). Although some fact patterns (e.g., those described in *Phillips, Kunin, Malerbi,* and *Heaton*) may test or exceed the scope of the ordinary usage of "mental illness," the depression at issue in this case does not.

I also disagree with those courts which have held that where definitions of "mental illness" are silent on causes, the term is ambiguous. In order for an ERISA term to be ambiguous, it must be capable of reasonable interpretations under which the insured is both covered and not-covered; or else create a contradiction on the face of the policy. I do not think it is reasonable to apply the term "mental illness" according to its cause in this case, however. To do so would invalidate the functional, ordinary meaning of the "mental illness", which does not usually consider ultimate causes. Furthermore, a great many "mental illnesses" are now traceable, at least in part, to chemical imbalances and other underlying physiological conditions. That other mental illnesses may not be traceable to physiological conditions I suspect is

less due to the metaphysical nature of those particular mental illnesses than it is due to current lack of medical knowledge. To say that an illness is not "mental" because it has an identifiable physical cause would narrow the term "mental illness" to an absurdly low number of conditions about which scientists do not currently have any physiological understanding. The number of such illnesses, in turn, would steadily dwindle with advances in research. If the definition of "mental illness" depends upon etiology, mental illness could never represent a calculable insurance risk, or be used correctly for very long in common discourse.

5. *The Limitation survives strict construction in this case.*

 Neither party offers a working definition of "strict construction." In *Dominion Resources, Inc. v. United States,* 219 F.3d 359, 370 (4th Cir.2000), the court defined the term positively as allowing a condition "only as long as there is a clear provision therefor." In *Pugh v. Lindsay,* 206 F.2d 43, 46 (4th Cir.1953), the court defined the term within the context of a Fair Labor Standards Act exemption: "it is incumbent upon one asserting an exemption to bring himself clearly and unmistakably within spirit and letter of its terms." Under Georgia insurance law, exclusions "must be defined clearly and distinctly." *American Southern Ins. Co. v. Golden,* 188 Ga.App. 585, 373 S.E.2d 652, 653 (1988). Exclusions are "liberally construed in favor of the insured to afford coverage." *Georgia Farm Bureau Mut. Ins. Co. v. Meyers,* 249 Ga.App. 322, 548 S.E.2d 67, 69 (2001) (citations omitted). Whereas *contra proferentem* construes ambiguities in favor of the reasonable expectations of the insured; strict construction construes lack of precision in favor of coverage.

As the previous section should make clear, I do not consider any lack of precision in the Limitation's use of "due to" to create coverage for Johnson. No matter whether "due to" means "caused exclusively by" or "caused in part by," the Limitation carves out a set of covered conditions, including Johnson's depression, for limited benefits. Johnson's case does not present one of mixed causes of disability such that I need fix the meaning of that term. Similarly, the failure to insert a term such as "no matter what the cause" into the definition of "mental illness" does not make the term any less clear. The normal usage of the term "mental illness" does not normally take into account the etiology of the illness, especially when the illness is depression. For these reasons, there is no basis for construing the Limitation in favor of coverage.

### III. CONCLUSION

For the foregoing reasons I **DENY** plaintiff's plea for a declaration that his disability is covered under the long term disability policy issued to him by the defendants, and all other related relief requested in his Complaint.